## BUCK v. STATE.

No. A-10172. May 26, 1943.
(138 P. 2d 115.)

E.M. Carter and D.E. Ashmore, both of Okmulgee, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and Jack Pitchford, Co. Atty., of Okmulgee, for defendant in error.

BAREFOOT, J. Defendant, G. R. Buck, was charged in the district court of Okmulgee county with the crime of arson, was tried, convicted, and sentenced to serve a term of two years in the State Penitentiary, and has appealed.

The only contention presented in the brief of defendant is that the evidence is insufficient to sustain the judgment and sentence, and that the court erred in refusing to direct a verdict of not guilty.

This case may be said to rest almost wholly upon circumstantial evidence. It presents to this court for the first time the question of the admissibility in evidence of the trailing of one by bloodhounds. We find that this question has heretofore been presented to the highest appellate courts of many states, and that some consideration has been given thereto by textbook writers. However, this court has never been called upon to consider the question, although the use of bloodhounds at the State Penitentiary has been in vogue for many years.

An investigation of the authorities has been most interesting and profitable. The earliest case in this country in which consideration was given to the ques-

tion was that of Hodge v. State, 98 Ala. 10, 13 So. 385, 39 Am.St.Rep. 17. In that case the death penalty was upheld, and the evidence of tracking by the dog to defendant's home was sustained as competent evidence. Since this case in 1893, many courts have passed upon the question, and by the great weight of authority it has been held that the evidence is admissible under certain rules and conditions, as will be hereinafter stated.

Among the states upholding the rule are Alabama, Florida, Iowa, Kansas, Kentucky, North Carolina, South Carolina, New York, Missouri, Ohio, Texas, Mississippi, Georgia, Tennessee, Arkansas and Louisiana; and the following texts are here cited: 16 C.J. 564; 8 R.C.L. 177, 184; 22 C.J.S. Criminal Law, § 646, p. 988, § 646; and Elliott on Evidence.

The states, some of which recognize that in some cases the evidence might be admissible yet refuse to follow the rule are Nebraska, Illinois, and Indiana, and one case from Iowa. Brott v. State, 70 Neb. 395, 97 N.W. 593, 63 L.R.A. 789; People v. Pfanschmidt, 262 Ill. 411, 104 N.E. 804, Ann.Cas.1915A, 1171; Ruse v. State, 186 Ind. 237, 115 N.E. 778, L.R.A. 1917E, 726; State v. Grba, 196 Iowa 241, 194 N.W. 250.

In the early case of State v. Thomas Hall, 4 Ohio Dec. 147, a history of the bloodhound is given as follows:

"It is a matter of common knowledge,and therefore a matter of which courts will take notice, that the breed of dogs known as bloodhounds is possessed of a high degree of intelligence, and acuteness of scent, and may be trained to follow human tracks with considerable certainty and success if put upon a recent trail. In Chambers' Encyc., under the title 'Bloodhound,' it is said of this dog, that 'it is remarkable for its exquisite scent and for its great sagacity and perseverance in tracking

any object to the pursuit of which it has been trained;' that 'it has been frequently used for the pursuit of felons and deer-slayers, and, in America, for the capture of fugitive slaves;' and the writer refers to the use of these dogs in border warfare, and to their importation 'into Jamaica in 1796 to be used in suppressing the Maroon insurrection, but the terror occasioned by their arrival produced the effect without their actual employment.' The Encyc. Britannica (9th Ed.) under the title 'Dog,' bears this testimony to the wellknown traits of this animal: 'The bloodhound is remarkable for its acuteness of scent, its discrimination in keeping to the particular scent on which it is first laid, and the intelligence and pertinacity with which it pursues its object to a successful issue. These qualities have been taken advantage of not only in the chase, but also in the pursuit of felons and fugitives of every kind. According to Strabo, these dogs were used in an attack upon the Gauls. In the clan feuds of the Scottish Highlands, and in the frequent wars between England and Scotland, they were regularly employed in tracking fugitive warriors, and were thus employed, according to early chroniclers, in pursuit of Wallace and Bruce. The former is said to have put the hound off the scent by killing a suspected follower, on whose corpse the hound stood. For a similar purpose captives were often killed. Bruce is said to have baffled his dogged pursuer as effectually, though less cruelly, by wading some distance down stream, and then ascending a tree by a branch which overhung the water and thus breaking the scent. In the histories of border feuds these dogs constantly appear as employed in the pursuit of enemies, and the renown of the warrior was great, who,
" 'By wily turns and desperate bounds,
     Had baffled Percy's best bloodhounds.'

"In suppressing the Irish rebellion in the time of Queen Elizabeth, the Earl of Essex had, it is said, 800 of these animals accompanying the army. * * *

"Both history, therefore, and natural history testify to the exceptional keenness of scent and capacity for train-

ing of this variety of hound. Whatever may be said of the wisdom or humanity of resorting to this means of detecting and securing the apprehension of criminals, there can be no doubt, that, where a well trained dog is set upon a recent track and follows it, in the usual manner of such dogs in following a trail, up to the person or home of the accused, these facts may, on the plain principles governing circumstantial evidence, be shown as tending to connect him with the crime charged. It was so held in the case of Hodge v. State, 98 Ala. 10 [13 So. 385], 39 Am.St.Rep. 17, which is the only case I have found directly in point.

"Of course, in such cases full opportunity should be given to inquire into the breeding, training and testing of the dog, and to all the circumstances attending the trailing in the case on trial, and to the manner in which the dog then acted and was handled by the person having it in charge. The weight to be given to the tracking as evidence against the accused will depend largely upon these matters."

Also, in the case of Blair v. Commonwealth, 181 Ky. 218, 204 S.W. 67, 68, in which a beautiful tribute is paid to the dog, where it is said:

"It is next insisted that the court should have sustained appellant's objection to the testimony relating to the trailing of Blair and Crump by two bloodhounds immediately after the offence was committed. The former opinion reiterated the rule upon that subject first announced in this state in 1898, in Pedigo v. Commonwealth, 103 Ky. 41, 44 S.W. 143, 19 Ky.Law Rep. 1723, 42 L.R.A. 432, 82 Am.St.Rep. 566, holding such testimony to be competent when properly guarded. The rule may now be said to be thoroughly established in this jurisdiction. Denham v. Commonwealth, 119 Ky. 508, 84 S.W. 538, 27 Ky.Law Rep. 171; Sprouse v. Commonwealth, 132 Ky. 269, 116 S.W. 344. And it cannot be said that the doctrine is wholly a novel one.

"If we may credit Sir Walter Scott, such evidence was looked upon with favor as early as the twelfth century. In the Talisman it is related that in the joint crusade of Richard I of England and Phillip II of France, Roswell, the hound, pulled from the saddle Conrade, Marquis of Montserrat, thus mutely accusing him of the theft of the banner of England. Phillip defended the Marquis with the remark:

" 'Surely the word of a knight and a prince should bear him out against the barking of a cur.'

"To which Richard replied:

" 'Royal brother, recollect that the Almighty who gave the dog to be companion of our pleasures and our toils, both invested him with a nature noble and incapable of deceit. He forgets neither friend nor foe; remembers, and with accuracy, both benefit and injury. He hath a share of man's intelligence, but no share of man's false-hood. You may bribe a soldier to slay a man with his sword, or a witness to take life by false accusation; but you cannot make a hound tear his benefactor; he is the friend of man save when man justly incurs his enmity. Dress yonder Marquis in what peacock robes you will, disguise his appearance, alter his complexion with drugs and washes, hide himself amidst a hundred men; I will yet pawn my scepter that the hound detects him, and expresses his resentment, as you have this day beheld.'

"The doctrine of the admissibility of bloodhound evidence in criminal prosecutions has been slowly gaining ground during the past 20 years. See Hodge v. State, 1893, 98 Ala. 10, 13 So. 385, 39 Am.St.Rep. 17; Parker v. State, 1904, 46 Tex.Cr.R. 461, 80 S.W. 1008, 108 Am.St. Rep. 1021, 3 Ann. Cas. 893; State v. Dickerson, 1907, 77 Ohio St. 34, 82 N.E. 969, 13 L.R.A.,N.S., 341, 122 Am.St.Rep. 479, 11 Ann.Cas. 1181.; State v. Hunter, 1907, 143 N.C. 607, 56 S.E. 547, 118 Am.St.Rep. 830; State v. Freeman, 1908, 146 N.C. 615, 60 S.E. 986; Spears v. State, 1908, 92 Miss. 613, 46 So. 166, 16 L.R.A.,N.S., 285.

"The general rules deductible from these decisions are as follows:

"(1) The bloodhound in question must be shown to have been trained to follow human beings by their tracks and to have been tested as to its accuracy in trailing upon one or more occasions; and,

"(2) The evidence of the acts of bloodhounds in following a trail may be received merely as circumstantial or corroborative evidence against a person towards whom other circumstances point as being guilty of the commission of the crime charged.

"The admission of this class of evidence is therefore hedged about with abundant safeguards in the way of other and human testimony; and as long as these rules are adhered to bloodhound evidence is no more dangerous than any other class of circumstantial evidence.

"In Kentucky it is settled that testimony as to trailing by bloodhounds of one charged with crime may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend to connect the defendant with the crime only after it has been shown by some one having personal knowledge of the facts: (a) That the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination; (b) is itself possessed of these qualities and has been trained or tested in the tracking of human beings; and (c) that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted, at the point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated had been made by him."

From a reading of the many cases above cited, and the texts, it may be said that the following conclusion has been reached with reference to the introduction of this character of testimony.

It is the better practice before this evidence is permitted to go to the jury that the court should first hear the evidence to ascertain the blood, age, training and experience of the dog, and whether it has been trained to follow trails of human beings by their tracks, and as to accuracy of trailing upon different occasions. The court then determines as a matter of law whether the evidence is such that permits its submission to the jury. If the court decides that the facts justify its submission, the jury is returned and all of the evidence in connection therewith, together with the expert testimony as to the training, blood, and experience of the dogs, is submitted to them under proper instructions of the court.

The case of Pedigo v. Commonwealth, 103 Ky. 41, 44 S.W. 143, 145, 42 L.R.A. 432, 82 Am.St.Rep. 566, above mentioned, is a leading case and is cited by many of the authorities. In the opinion it is said:

"After a careful consideration of this case by the whole court, we think it may be safely laid down that, in order to make such testimony competent, even when it is shown that the dog is of pure blood, and of a stock characterized by acuteness of scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid on the trail, whether visible or not, concerning which testimony has been admitted, at a point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him. When so indicated, testimony as to the trailing by a bloodhound may be permitted to go to the jury for what it is worth, as one of the circumstances which may tend

to connect the defendant with the crime of which he is accused."

There is a strong dissenting opinion in this case, and it is cited by the authorities holding to the contrary view, and especially in the case of Brott v. State, 70 Neb. 395, 97 N.W. 593, 63 L.R.A. 789, which is the leading case upholding the doctrine that bloodhound testimony is inadmissible under any circumstance, holding that it is hearsay testimony, and unworthy of belief.

In the early case of Parker v. State, 46 Tex.Cr.R. 461, 80 S.W. 1008, 1010, 108 Am.St.Rep. 1021, 3 Ann.Cas. 893, the Court of Criminal Appeals of that State in a murder case depending upon circumstantial evidence said:

"Appellant complains of the action of the court receiving the following testimony, over his objections: W. D. Snodgrass was introduced as a witness for the state, and in substance stated that he was constable of precinct No. 1 of Titus county, Tex., and when he heard of the homicide he went over to where it occurred, and carried Sam Porter's dog; that this dog was kept for the purpose of running people, and was a bloodhound; that he had had experience with this dog, and it had been trained and reliable; that if he was taken to a place, and put on the track, and if ever opened on the track, he would run that track to its destination, and he would run no other track except that particular track; after he run said track to its destination he could be put on another track; that he was present when the dog was put on the track at the scene of the killing; that he kept up with him a part of the way, but he ran so fast he could not keep up all the way; that when he got to where appellant lived the dog was there. Appellant objected to that part of the evidence where the witness testified that the dog would keep the track; that he would run it till he reached its destination—because said evidence was necessarily the expression of the witness' opinion in the matter, about which he could give no opin-

ion. Appellant also objected to the acts of the dog running the track, on the ground that said evidence was immaterial, irrelevant, hearsay, and a matter wholly disconnected from the defendant, and was a transaction that occurred when defendant was not present, and one for which he could not be bound. The court, in overruling the objections, explained that the witness said he had seen this dog tried often, and he spoke from experience with the dog. With reference to the last proposition— that is, whether testimony is admissible that the dog took a certain track, and trailed it to appellant's house—we would observe that—so far as we are advised, the authorities are not numerous. Such testimony, however, has been held admissible in Alabama and Kentucky, and perhaps other states. See Hodge v. State, 98 Ala. 10, 13 So. 385, 39 Am.St.Rep. 17; Simpson v. State, 111 Ala. [6] 7, 20 So. [572] 573; Pedigo v. Commonwealth, 103 Ky. 41, 44 S.W. 143, 42 L.R.A. 432, 82 Am.St.Rep. 566. In the latter case the court, citing two other cases, bases its opinion as to the admissibility of such evidence upon our common knowledge and experience with reference to the qualities of trained dogs of certain pure breeds, and that such evidence is admissible, in connection with other circumstances, as a fact or circumstance tending to connect a party with a crime. * * * It occurs to us that the reason for the admissibility of such testimony is founded upon correct logic. It is a matter of common knowledge and observation that trained animals of the hound species are capable of trailing and following tracks of human beings, and they have been used time out of mind for that purpose. Here, according to the testimony of the witness, the track assumed to be that of the supposed murderer, and which the circumstances in evidence tend to show was his track, was pointed out to the dog. He trailed this track from where it was pointed out to him to the residence of the defendant, some mile and a half; and the course of his pursuit of the track was followed by witnesses who testified in the case, and they show that the dog followed this track which they saw upon the ground, and which they de-

scribed to the jury. We hold that this character of testimony is admissible."

In the case of State v. Rasco, 239 Mo. 535, 144 S.W. 449, 458, it is said:

"It is now urged upon the court that testimony of this character is so unreliable that it should not have been admitted in any event, and, further, that the preliminary testimony was not sufficient to show the hounds were qualified. We have examined this question with a good deal of attention, both as to the facts in evidence and as to the law. It is a novel question in this state, but has been the subject of adjudication in other jurisdictions. The Supreme Court of Nebraska has ruled against the admission of evidence of the character in question, on the ground that it is intrinsically unreliable. Brott v. State, 70 Neb. 395, 97 N.W. 593, 63 L.R.A. 789. In our judgment, what is said in that case goes to the weight rather than to the competency of the evidence. It is a fact beyond controversy that dogs, in common with many others of the lower animal species, possess a sense of smell developed to a degree which is almost beyond our comprehension. In many cases this sense of smell is their chief protection against enemies. Hunters fully appreciate this fact in attempting to approach wild game. It is a fact also, abundantly demonstrated, that dogs can and have followed with accuracy unseen, blind, and intricate trails, guided only by the sense of smell. It has been further demonstrated that pure-bred bloodhounds possess in high degree the power to follow the trail of a human being over long distances. Measured by the usual standards applied to the admissibility of testimony, we must concede that the actions of a properly bred and trained bloodhound, when set upon the trail of a human being, are competent evidence as tending to show the direction and distance followed by such person along such trail, and the point where it ends. We cannot demand absolute assurance of the impossibility of error as a test for the reception of testimony. We must depend largely upon the law of probabilities. The courts

of many states, including Alabama, Florida, Iowa, Kansas, Kentucky, North Carolina, Ohio, and Texas, have ruled such evidence admissible, upon a sufficient preliminary showing being made as to the breeding, capacity, training, and experience of the hounds. Aside from the Nebraska case above referred to, the decisions are practically unanimous for the admission of the testimony. There is not an important feature presented in the case at bar that has not been ruled upon in one or more of these decisions.

"It is strongly urged by the defendant that the great number of visitors upon the premises must have so confused and obliterated the footprints as to make it highly improbable that the hounds could pick up and follow any particular trail; also, that after so long a time (some 16 or 18 hours intervening between the killing and the arrival of the hounds) the scent would have become seriously impaired or lost altogether.

"In the case of State v. Dickerson, 77 Ohio St. 34, 82 N. E. 969 [13 L.R.A.,N.S., 341], 122 Am.St.Rep. 479, 11 Ann. Cas. 1181, the hounds arrived the day after the body of deceased was found, and in the meantime 'very many people, old and young, had trodden upon and over this scene.' The court ruled that these facts went to the weight of the testimony only. The Dickerson case treats of the question of admissibility of bloodhound evidence very exhaustively, and discusses at length the cases theretofore decided, and deduces from their consideration the following rule: 'We think that, from a comparison of the views expressed by the different courts from which we have quoted, there may be deduced a rule which, until shown untrustworthy, may be followed in cases where this class of evidence is offered. It is apparent that, before the acts and conduct of the dog can be shown, a proper preliminary foundation must be laid, and to establish such foundation it must be shown that the particular dog used was trained and tested in tracking human beings, and by experience had been found reliable in such cases; that the dog so trained was laid on the trail, whether it was visible or invisible, at the point where the circumstances tend-

ed clearly to show that the guilty party had been, or upon a track which the circumstances indicated to have been made by him. In addition to this, the reliability of the dog must be proved by a person or persons having personal knowledge thereof. This foundation may be strengthened by proof of pedigree, purity of blood, or the exalted standing of his breed in the performance of such peculiar work.' "

This case sets out in full instructions given by the court to the jury, and which go very much into detail, more so than in the instant case, but the principles there announced are such as show how this evidence should be considered by the jury.

See, also, the following cases: Hodge v. State of Alabama, 98 Ala. 10, 13 So.385, 39 Am.St.Rep. 17; Pedigo v. Commonwealth, 103 Ky. 41, 44 S.W. 143, 42 L.R.A. 432, 82 Am.St.Rep. 566; State v. Hall, 4 Ohio Dec. 147; Parker v. State, 46 Tex.Cr.R. 461, 80 S.W. 1008, 108 Am.St.Rep. 1021, 3 Ann.Cas. 893; Blair v. Commonwealth, 181 Ky. 218, 204 S.W. 67; Brummett v. Commonwealth, 263 Ky. 460, 92 S.W. 2d 787; State v. Adams, 85 Kan. 435, 116 P. 608, 35 L.R.A.,N.S., 870; State v. Netherton, 133 Kan. 685, 3 P. 2d 495; Hargrove v. State, 147 Ala. 97, 41 So. 972, 119 Am.St.Rep. 60, 10 Ann.Cas. 1126; McDonald v. State, 145 Ark. 581, 224 S.W. 976; Holub v. State, 116 Ark. 227, 172 S.W. 878; State v. Steely, 327 Mo. 16, 33 S.W. 2d 938; State v. Freyer, 330 Mo. 62, 48 S.W. 2d 894; West v. State, 150 Ark. 555, 234 S.W. 997; State v. Rasco, 239 Mo. 535, 144 S.W. 449; Copley v. State, 153 Tenn. 189, 281 S.W. 460; Adams v. State, 149 Ark. 669, 235 S.W. 372; State v. Dickerson, 77 Ohio St. 34, 82 N.E. 969, 13 L.R.A., N.S., 341, 122 Am.St.Rep. 479, 11 Ann.Cas. 1181; People v. Whitlock, 183 App.Div., N.Y., 482, 483, 171 N.Y.S. 109; State v. Harrison, 149 La. 83, 88 So. 696; State v.King, 144

La. 430, 80 So. 615; State v. Freeman, 146 N.C. 615, 60 S.E. 986; Aiken v. State, 16 Ga.App. 848, 86 S.E. 1076; State v. McLeod, 196 N.C. 542, 146 S.E. 409; Tomlinson v. State, 129 Fla. 658, 176 So. 543; Harris v. State, 143 Miss. 102, 108 So. 446; Hinton v. State, 175 Miss. 308, 166 So. 762; and cases to the contrary: Brott v. State, 70 Neb. 395, 97 N.W. 593, 63 L.R.A. 789; People v. Pfanschmidt, 262 Ill. 411, 104 N.E. 804, Ann. Cas. 1915A, 1171; Ruse v. State,186 Ind. 237, 115 N.E. 778, L.R.A. 1917E, 726; State v. Grba, 196 Iowa 241, 194 N.W. 250.

Having reached the conclusion that the evidence of the trailing of a human being by bloodhounds which have been found to be of proper breeding and properly trained, as above outlined, is supported by reason, and the great weight of authority, we come to apply this law as to the facts in the instant case and with the burning of a barn owned by Jessie Reavis in Okmulgee county, on August 22, 1938.

Defendant lived less than a mile from the home of Mr. Reavis. On the morning of August 22, 1938, Mr. Reavis was awakened about 4 o'clock and discovered his barn was on fire. It with all the contents burned to the ground. He immediately telephoned the sheriff of Okmulgee county, requesting that he at once secure bloodhounds from the State Penitentiary and come to his premises. Two men, M. I. Stokes and Hubert Wilson, came from the penitentiary, bringing with them "Old Boston," and "Diana," and with the sheriff of Okmulgee county reached the home of Mr. Reavis around 10 o'clock in the forenoon, about five and a half hours after the fire was discovered. No one had been permitted to go near the barn until the sheriff and party arrived with the dogs. The dogs were turned loose, and immediately began to look

for tracks. Soon "Old Boston" took up a trail, leading toward a dry branch, and was soon joined by "Diana." They followed this trail but lost the same, and picked it up again at the top of the creek bank, following it some distance until they came to a fence. The sheriff, Mr. Stokes, and Mr. Wilson followed the dogs to this point and here discovered where a horse had been recently tied to a tree, and from an examination they determined that the horse had been there for something near an hour and a half. They examined the tracks of the horse and found that it was unshod and that one hoof made a very peculiar track. The horse had traveled through high weeds and grass from this point, and the dogs would not trail the horse, only when the body of the person riding had come in contact with the weeds or grass, and Mr. Stokes could tell by the "yelp" of "Old Boston," when he contacted the trail in this manner. The officers followed the tracks of the horse some distance to where it entered a gate near defendant's home. The dogs here gave evidence of finding the trail which they had been following, evidently when the person dismounted to open the gate. The footprints of the horse were followed to the premises, and the sheriff there found a horse which was wet with sweat, showing evidence of having been recently ridden. One hoof of this horse revealed that it was the horse that had made the track they had been following from the tree where it had been tied. He also found a saddle blanket damp with sweat.

The officers ascertained that defendant, who lived at the premises where the horse was found and to where the dogs had gone, was not at his home. The dogs were then turned loose near the house, and soon took up a trail which they followed to a house where the brother-in-law of defendant lived. They were there informed

that defendant had gone to the town of Mounds. They returned with the dogs to near the home of defendant, and awaited his return. In the afternoon defendant was seen coming towards his home, walking. His wife went to meet him. The dogs were taken to the point where defendant was seen and when turned loose took up the trail direct to defendant's home.

It may be here stated that in all of the cases above cited, it is the unanimous statement of all the trainers of bloodhounds that when they are placed upon an individual trail, they will never quit that trail until they are called off, and again put upon some other trail. They will trail where many persons have been and other tracks made, but they will not leave the tracks of the party whose trail they are following. A reading of the cases cited will well illustrate this statement.

In a number of cases heretofore cited, and which follow the rule that the evidence is admissible as a circumstance to be considered by the jury, together with the other evidence in the case and under proper instructions from the court, we come to the consideration of the other evidence offered by the state in the instant case. As before stated, it is almost wholly circumstantial.

The facts relied upon by the state to corroborate the evidence of the bloodhounds are, (a) the tracking of the horse by means of the peculiar track or hoof, from the point where it had been tied, to defendant's lot, and finding the horse therein; (b) the evidence that the horse had been recently ridden and showed wet sweat; (c) the finding of the saddle blanket which also showed that it had recently been used; (d) certain statements made by defendant at first denying to the officers that the horse had been ridden by him that morning, and later test-

ifying at the preliminary hearing that he had ridden the horse that morning about a quarter of a mile, to get the mail; and (e) the testimony of James Brown, a neighbor.

James Brown testified that he lived near defendant and Mr. Reavis, and had known them both for a number of years. That some time in February, 1937, he was working on a fence and the defendant rode up and the following conversation took place:

"He said, 'How are you and your friend Reavis getting along?' I said, 'All right, as far as I know.' I said, 'I tend to my own business and he tends to his.' I said, 'That is, at least he aint tending to my business that I know anything about,' and he said, 'Wouldn't it be funny if somebody would catch them gone and slip in there and burn everything they had to the ground?' I told him no, I didn't think it would be very funny."

The defendant offered evidence attempting to show that this witness was mentally incapable of testifying. This, however, was a question for the consideration of the jury, they had the opportunity to see the witness and to know what consideration should be given to his testimony by reason of any physical conditions.

There was also some evidence offered to show a feeling of enmity between defendant and the prosecuting witness, which was not very strong.

The evidence with reference to the history, qualification and experience of the dogs was given by the witness M. I. Stokes. He testified that he was employed by the State of Oklahoma at the State Penitentiary at McAlester. That he had charge of the dogs, about 15 or 20 in number. That the witness Hubert Wilson was a trusty at the penitentiary who had been appointed to assist him in handling the dogs. That the witness had had

15 or 20 years' experience in the handling of dogs. That he had been at the State Penitentiary at McAlester in this capacity for about three years, and that the two dogs which he brought to Okmulgee on the 22nd of August, 1938, were "Old Boston," and "Diana." That he selected them as his two best dogs from a pack of 15 or 20. "Old Boston" was nine years old and "Diana" a younger dog. He testified at length as to the experience and training which these dogs had received, and especially "Old Boston," and gave individual instances of performances by him in the trailing of human beings. He testified:

"Q. And they can distinguish between the smells of human beings? A. I will answer that question like this, it has been my experience with bloodhounds, with a trained bloodhound, they have an instinct, we call it, I call it a sense to trail a man better than any other dog would trail anything else, and apparently they have an instinct that will enable them to carry a trail through places that apparently other dogs couldn't carry it at all, and they always know one track from the other. It is impossible for you to cause them to change tracks, they won't do that. Q. You mean, if he is a well trained and experienced bloodhound, if he starts on the track of one human being, he will stay with that particular track? A. He will trail no other track than that. It is impossible to get him to change tracks. * * * Q. Does it make any difference whether the trail is fresh or cold? A. Those two dogs I had there would trail a 24 hour track. I have known them to do that. They wouldn't trail as fast as one we call warmer, fresher track, you understand, but those dogs would trail a ten or twelve hour track and move right along with it; but a four or five hour track is nothing at all for them. Q. Would that be considered a comparatively fresh trail? A. It certainly would. Q. Now then, you used Old Boston as the lead dog, did you? A. Yes, sir. However, we had this Diana there, one of the greatest dogs I ever knew and one of the most accurate dogs. Q.

Did you select those two dogs out of a kennel of how many dogs?  A. We had 15 or 20 dogs, but on all special occasions I used those two dogs because they were the best I had and the best I ever saw.  Q. Let's take, for instance, Old Boston, I understand he has since died, since the trailing of this track up there?  A. Yes, sir.  Q. When did she die?  A. Boston died, I think, about a month after I left down there.  Q. To refresh your memory, was it sometime in March, 1939?  A. Right along then, yes, sir.  Q. And what age dog was she?  A. Boston was about nine years of age.  Q. Was that dog owned by the State of Oklahoma?  A. Yes, sir.  Yes, she was owned by the state.  Q. How long were you its keeper or trainer?  A. Boston, individually?  Q. Yes.  A. I only ran Boston about two and a half years.  I used him some several years before that when they first got him from Texas. That was before I went to Granite.  Q. What age dog was he, if you know, when he was brought to Oklahoma? A. He was said to be about three years of age.  Q. Have you ever seen him on a man's trail?  A. Yes, several hundred. * * *  Q. Did you ever know Old Boston to lie on any trail?  A. I never knew him to make a mistake. * * *  A. I would have to answer that question like this, that this Master Mind dog of Pennsylvania has a greater reputation than Boston.  Boston was considered the second dog in the United States at that time."

He then testified to the individual work of these dogs in many cases that came under his personal observation, and where they had successfully tracked human beings, and then testified as to the instant case as above related. On cross-examination he was asked:

"Q. There hasn't been any monument or any money or anything appropriated to build a monument to Boston since he died?  A. I don't know.  There ought to be."

In view of this testimony, we have decided that the tribute to the hound by Richard I of England, as above quoted, shall be a monument or tribute to "Old Boston,"

and for this reason we perpetuate his name in the lawbooks of this state. Though the state has not erected a monument to his memory, his services will ever be remembered, not only in the instant case but others.

As above stated, the evidence in this case is almost wholly based upon circumstantial evidence, and while we recognize the rule announced in the decisions which have been cited, that a conviction will not be upheld upon the evidence alone of trailing by bloodhounds, yet that evidence being competent as a circumstance, together with the other evidence in the case, where competent proof has been given as to the qualifications, training and experience of the bloodhounds used, as in the instant case, this testimony together with the other evidence in the case presented a question of fact for the jury to pass upon as to the guilt or innocence of the defendant.

There can be no question but that the evidence as to the training and experience of the two dogs, and especially "Old Boston," was such that it entitled the court to submit it to the jury for their consideration, together with the other facts and circumstances, and under the law we cannot say that the verdict of the jury should be set aside.

We have, therefore, reached the conclusion that the judgment and sentence of the district court of Okmulgee County should be affirmed.

JONES, P. J., and DOYLE, J., concur.