[No. F010802. Fifth Dist. Feb. 27, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
PETER T. GONZALES, Defendant and Appellant.

**COUNSEL**

William R. Higham, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, William G. Prahl and Robert C. Miller, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**ARDAIZ, J.**—An information filed on March 3, 1988, charged appellant Peter T. Gonzales with having committed a burglary, a violation of Penal Code section 459.[1] The information also contained an enhancement allegation, claiming appellant had served a prior state prison term (§ 667.5, subd. (b)).

After his arraignment, appellant pleaded not guilty and denied the allegation. On the day of trial appellant admitted the truth of the allegation. After a one-day trial, the jury found appellant guilty.

Appellant received a seven-year state prison term; a six-year upper term was imposed on the burglary conviction and a one-year enhancement for the prior prison term.

Appellant filed a timely notice of appeal.

FACTS

On February 9, 1988, at approximately 9 a.m., Deputy Sheriff Brockway responded when a silent alarm went off at a rural home in Earlimart. He found a car, whose engine was still warm, parked in the back. A sliding glass door had been shattered and opened. The deputy called for a backup unit.

---

[1] All statutory references are to the Penal Code unless otherwise indicated.

Deputy Brockway entered the house. Immediately he was confronted with a man, not appellant, piling goods in the center of the living room. The man fled; the deputy then heard, in another section of the house, the sound of breaking glass. He drew his gun knowing there were at least two suspects in the house. He went to the bedroom in the front of the house. The window was broken out.

The deputy looked out and saw a man running away from the house. Juniper bushes, four to five feet tall, partially blocked the deputy's view of the man. He could see him only from the shoulders up. The deputy could say the man was not the individual he had seen in the living room. The deputy could only describe the fleeing man as a Mexican male, with dark curly hair and of a heavier build than the man seen in the house. When last observed, the person was seen heading east from the corner of Roads 48 and 148.

Just as the deputy was viewing the man fleeing, he heard the sound of an engine starting. He ran to the back of the house only to find the car seen upon his entry leaving; the man who had been in the living room was driving. The deputy fired at least one shot at the departing car.

Deputy Brockway then testified that some time after this, a man drove by in a white truck and reported seeing a Mexican male running east. The deputy asked the man in the truck to keep his eye on the man running; the man drove away and the deputy did not see the driver or the truck again.

Approximately 25 minutes after the call for a backup unit was sent, Deputy Blagg and his dog "Rookie" arrived at the scene. A pillowcase was found outside the home containing some household articles. It was located near where the running man had last been seen. At trial, one of the residents of the house identified the pillowcase as his.

Rookie smelled the pillowcase and ran off, unleashed, ahead of Deputy Blagg in an easterly direction. The accompanying officer observed footprints, approximately 10 to 12 feet from the pillowcase, leading in the direction taken by the dog; the shoe impressions reappeared intermittently along the path taken by Rookie where the person leaving them had gone off the hardpan into the plowed dirt. Along the route, a clean dime was found. Rookie continued eagerly on the trail.

When they had traveled approximately nine-tenths of a mile, Rookie crossed over into an unplowed vineyard with three to four feet of weeds growing between the rows. The officer spotted appellant lying prone in the tall grass across the area between the rows with his arms extended in front

of him "up on the berm of the vineyard." The "berm" is a raised area upon which the row of vines is planted.

Appellant was ordered up and out. He did not move. Rookie was sent in to get him. Appellant responded more readily to Rookie's prompting than the officer's. Perhaps this is because Rookie bit him, the officer having warned appellant the dog would do so if appellant did not come out.

### DISCUSSION

### I

*Whether the Trial Court Failed to Instruct the Jury Properly as to the Weight to Be Given Dog-tracking Evidence and, if so, Whether Appellant Was Prejudiced Thereby.*

In the instant case, the trial court gave an instruction on dog-tracking evidence:

"You have heard evidence in this case regarding the use of a dog in the apprehension and identification of the alleged perpetrator of the offense charged herein.

"In determining the weight, if any, to be given this testimony, you are instructed to consider the following factors:

"1. Whether or not the handler was qualified by training and experience to use the dog.

"2. Whether or not the dog was adequately trained in tracking humans.

"3. Whether or not the dog has been found reliable in tracking humans.

"4. Whether the dog was placed on the track where circumstances have shown the guilty party to have been.

"5. Whether or not the trail had become stale or contaminated."

Appellant maintains the instruction given by the court was incomplete, contending the jury needed also to be instructed that dog-tracking evidence requires corroboration. Appellant cites *People* v. *Malgren* (1983) 139 Cal.App.3d 234, 242 [188 Cal.Rptr. 569], wherein the court stated: "We hold, then, that the trial court should have instructed *sua sponte* that (1) when dog tracking evidence is used to prove the identity of a defendant, there must be some other evidence, either direct or circumstantial, which supports the accuracy of that identification evidence; and (2) in determining

what weight to give such evidence, the jury should consider the training, proficiency, experience, and proven ability, if any, of the dog, its trainer, and its handler, together with all the circumstances surrounding the trailing in question."

While appellant concedes the trial court's instruction satisfies the second part of the instruction found required by *Malgren,* no instruction was given on the necessity of corroboration or whether, as appellant contends, that corroboration must be independent evidence that *of itself* linked appellant to the crime.

The People contend: "[T]he court in *Malgren* does not require that the jury must find other *independent* evidence as to the defendant's identification, but rather, that the jury must be instructed to find some evidence which supports the *accuracy* and therefore the reliability of the circumstantial identification of the defendant produced by the fact that the dog located the defendant at the end of a trail leading to the defendant from the scene of the crime." (Italics in original.) The People argue that by instructing the jury that considerations of the weight to be given dog-tracking evidence include "[w]hether the dog was placed on the track where circumstances have shown the guilty party to have been" and "[w]hether or not the trail had become stale or contaminated," the jury was in fact "instructed to find that the dog did follow the trail on which circumstances indicated the guilty party to have been."

We conclude the instruction given in the instant case was incomplete under *Malgren*; the trial court failed to instruct the jury that it must find other circumstances which supported the accuracy of the dog-tracking evidence.[2] ▆▆ However, in so concluding, we emphasize that the corroborating evidence necessary to support dog-tracking evidence need not be evidence which independently links the defendant to the crime; it suffices if the evidence merely supports the accuracy of the dog tracking.

The essence of the holding in *Malgren* is that dog-tracking evidence is insufficient of itself to support a finding of guilt. The court in *Malgren* first asserts as the general rule that there must be other sufficient incriminating evidence to uphold the conviction. (*People* v. *Malgren, supra,* 139 Cal.App.3d at p. 239.) The court then proceeds to cite a chain of circumstantial evidence apart from the dog-tracking evidence that is corroborative of the accuracy of the dog-tracking evidence. In *Malgren,* evidence included that the dog tracked through a damp grassy game preserve and the

---

[2] Because it is unchallenged by the parties, we do not consider the propriety of *Malgren*'s making such instruction to the jury sua sponte.

defendant's "pants legs were wet, and his tennis shoes were muddy and wet and grass-stained" supporting "the reasonable inference that he had just run from the home through the game reserve." (*Id.* at p. 240.) "Although the night was cold, appellant was panting and perspiring, as if he had been running." (*Ibid.*) The defendant was found hiding in the bushes less than seven-tenths of a mile north of the house burglarized approximately 30 minutes after the burglary. Other evidence included burglar's tools found on the trail. The *Malgren* court found the combination of all the circumstantial evidence sufficient to support the conviction.

In essence, *Malgren* resolved that even if all the factors assuring trustworthiness of the dog's tracking ability were present, there must be some other evidence aside from what the dog did that demonstrates the accuracy of what the dog did. By example, that the man tracked in *Malgren* was the man found was corroborated by the fact that the bottoms of his pants and his shoes were wet and the dog had tracked through a wet, muddy area where a person walking or running would have gotten his pants and shoes wet. Such evidence corroborated the accuracy of the dog—that the man tracked was the man found.

The factors referred to in the instruction in the instant case, "whether the dog was placed on the track where circumstances have shown the guilty party to have been" and whether the trail had "become stale or contaminated" are factors that help to ensure the dog has a fresh scent, but they do not, as claimed by respondent, corroborate that the person located is the person who was tracked. The dog's actions in locating an individual require assurance that the person located is the person pursued, as well as being the person who in fact left the initial scent followed by the dog.

The People do not challenge the rule that dog-tracking evidence is insufficient of itself to support a conviction; we, therefore, do not address the issue except to note it is a majority rule in jurisdictions accepting this type of evidence. (*State* v. *Loucks* (1983) 98 Wn.2d 563 [656 P.2d 480, 482]; *People* v. *McPherson* (1978) 85 Mich.App. 341 [271 N.W.2d 228, 229-230]; *People* v. *Centolella* (1969) 61 Misc.2d 723 [305 N.Y.S.2d 279, 283]; see generally cases cited in Annot., Evidence of Trailing by Dogs in Criminal Cases (1968) 18 A.L.R.3d 1221, Necessity of Corroborating Evidence to Support Conviction, § 6, p. 1238.) The court in *Malgren* joined in that conclusion and we do not dispute it here. (*Malgren, supra,* 139 Cal.App.3d at p. 239.)

Having concluded a conviction cannot rest on dog-tracking evidence alone and that the factors enumerated by the trial court did not require the jury to find corroborative evidence as generally stated, we must

determine whether the type of corroborative evidence necessary to support a conviction where dog-tracking evidence is used must be evidence that independently links the accused to the crime or merely evidence supporting the identification implied by the dog-tracking evidence.

■ First of all, there is a distinction between whether evidence is trustworthy and whether it is substantial. Pursuant to Evidence Code section 405, the trial court makes an initial determination of preliminary fact designed to assure the trustworthiness of the proffered evidence.[3] The fact of admissibility pursuant to Evidence Code section 405 does not, however, guarantee the substantiality or sufficiency of the evidence to support a subsequent verdict. For example, that the court determines, based upon a preliminary fact presentation, that a witness is competent to testify does not ensure the testimony given by that witness will suffice to support a verdict. (See *People* v. *Tyree* (1913) 21 Cal.App. 701, 706 [132 P. 784]; see also *People* ex rel. *Dept. of Pub. Wks.* v. *Anderson* (1965) 236 Cal.App.2d 683, 692 [46 Cal.Rptr. 377].) Likewise, evidence may be trustworthy but, of itself, may be insufficient to support a conclusion of guilt beyond a reasonable doubt. Other, incriminating evidence, that is, corroborative evidence is necessary.

■ Appellant would have us hold the nature of the corroborative evidence necessary here is identical to that required to support accomplice testimony. We find such an analogy inappropriate. Dog-tracking evidence is not "inherently suspect because of a self-interested source." (*People* v. *Malgren, supra*, 139 Cal.App.3d at p. 241.) The rationale for independent corroboration of accomplice testimony is predicated upon the need to ensure the trustworthiness of the information, not upon whether the evidence is substantial in and of itself.

" 'The rationale for requiring corroboration of an accomplice is that the hope of immunity or clemency in return for testimony which would help to convict another makes the accomplice's testimony suspect, or the accomplice might have many other self-serving motives that could influence his

---

[3] Evidence Code section 405 provides: "With respect to preliminary fact determinations not governed by Section 403 or 404: [¶] (a) When the existence of a preliminary fact is disputed, the court shall indicate which party has the burden of producing evidence and the burden of proof on the issue as implied by the rule of law under which the question arises. The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises. [¶] (b) If a preliminary fact is also a fact in issue in the action: [¶] (1) The jury shall not be informed of the court's determination as to the existence or nonexistence of the preliminary fact. [¶] (2) If the proffered evidence is admitted, the jury shall not be instructed to disregard the evidence if its determination of the fact differs from the court's determination of the preliminary fact."

credibility.' [Citation.] For these reasons, 'the evidence of an accomplice should be viewed with care, caution and suspicion. . . .' [Citation.] To prevent convictions from being based solely upon evidence from such inherently untrustworthy sources, the Legislature enacted section 1111 to require corroboration whenever an accomplice provided the evidence upon which a conviction was sought." (*People* v. *Belton* (1979) 23 Cal.3d 516, 525 [153 Cal.Rptr. 195, 591 P.2d 485].)[4]

We are not concerned with self-serving motivations on the part of the tracking animal, rather, we are concerned with the reliability of the evidence in each case.

While dog-tracking evidence as a class of evidence is somewhat novel in a day and age that exalts its technical devices, it remains viable and useful because we cannot duplicate it. We are incapable of mechanically detecting and following a scent; similarly, once the dog has concluded trailing, we cannot verify through "scent" evidence the accuracy of the dog's performance.

When referring to dog-tracking evidence, we acknowledge the antiquity of its use and the on-going dispute as to its reliability. Often quoted is the statement in *Buck* v. *State* (1943) 77 Okla.Crim. 17 [138 P.2d 115, 117]: " 'If we may credit Sir Walter Scott, such evidence was looked upon with favor as early as the twelfth century. In the Talisman it is related that in the joint crusade of Richard I of England and Phillip II of France, Roswell, the hound, pulled from the saddle Conrade, Marquis of Montserrat, thus mutely accusing him of the theft of the banner of England. Phillip defended the Marquis with the remark:

" ' "Surely, the word of a knight and a prince should bear him out against the barking of a cur." '

" 'To which Richard replied:

" ' "Royal brother, recollect that the Almighty who gave the dog to be companion of our pleasures and our toils, both invested him with a nature noble and incapable of deceit. He forgets neither friend nor foe; remembers, and with accuracy, both benefit and injury. He hath a share of man's

---

[4] Section 1111 provides: "A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

intelligence, but no share of man's falsehood. You may bribe a soldier to slay a man with his sword, or a witness to take life by false accusation; but you cannot make a hound tear his benefactor; he is the friend of man save when man justly incurs his enmity. Dress yonder Marquis in what peacock robes you will, disguise his appearance, alter his complexion with drugs and washes, hide himself amidst a hundred men; I will yet pawn my scepter that the hound detects him, and expresses his resentment, as you have this day beheld." ' "[5]

That the nature of this class of evidence leads to a review of somewhat elderly authority does not deprive that authority of its force today. The observations of the court in *Blair* v. *Commonwealth* (1918) 181 Ky. 218 [204 S.W. 67] retain their vitality. After enumerating the factors which determine admissibility (training, etc.) the court noted, "The admission of this class of evidence is therefore hedged about with abundant safeguards in the way of other and human testimony; and as long as these rules are adhered to [dog-tracking] evidence is no more dangerous than any other class of circumstantial evidence." (*Id.* at p. 68.)

The fact that the dog tracks a particular person or that the person found is the person tracked does not, of itself, prove guilt. What we are concerned with is the possibility that the dog could have erred. Obviously, if we were convinced of the infallibility of the dog, the evidence would speak for itself and would not, as a matter of law, require corroboration. The circumstances of the dog tracking would determine the conclusiveness of the evidence on the question of the identification. In other words, if we could be assured the scent the dog picked up from the pillowcase in question here was the scent of appellant, and if we could be assured the person found was the person who left the scent, we would conclude appellant handled the pillowcase. Since it is reasonable to conclude here the person handling the pillowcase was the perpetrator of the burglary (all other inferences being reasonably excluded), the evidence might be sufficient to support the conclusion of guilt.

The difficulty is that we want to assure ourselves the dog did not err either in picking up the scent of the person who handled the pillowcase or in following that scent to the person found. It is not a question of trustworthiness, it is a question of substantiality—while the evidence might be trustworthy, we are not willing to rest our verdict on that evidence alone. We want other evidence that will validate its veracity.

---

[5] To the statement of Phillip of France, "Surely the word of a knight and a prince should bear him out against the barking of a cur," we would simply add a more modern response: "It depends on what prince and which dog."

Historically, many jurisdictions looked upon dog-tracking evidence as evidence of the "weakest character," just as they once looked upon expert testimony as evidence of little substance. In addressing the concerns with respect to dog-tracking evidence, the court in *State* v. *Grba* (1923) 196 Iowa 241 [194 N.W. 250, 259] stated: "All of the courts that admit such evidence concede that it is merely a circumstance and is 'of the weakest character.' If the bloodhound is infallible because of his animal instincts, then evidence of his conduct in tracing a human being would rather be of the highest character than 'merely a circumstance of the weakest character.' If invariable animal instinct guides him accurately in the matter, then his conduct in trailing an alleged criminal would be quite conclusive.

"It is conceded by all courts, and must be from the facts of the case, that the bloodhound is not infallible, that he does make mistakes, and that he does not invariably follow a trail without deflection therefrom and with absolute certainty. In other words, the bloodhound may be right in what he does, and he may be wholly wrong. How is it possible to know in any particular case whether he is right or wrong?"

While most jurisdictions have overcome the reservations expressed in *Grba* with respect to admissibility of the evidence, these jurisdictions generally retain reservations about the possibility of inaccuracy of the evidence. It is evident the dog cannot be cross-examined and there is always the possibility that the dog may err in its actions. Because of these reservations, we require the evidence be corroborated. "Unlike accomplice testimony, dog tracking evidence is not inherently suspect because of a self-interested source. [Citation.] The notion that such evidence is of slight probative value or must be viewed with caution stems at least in part from fear that a jury will be in awe of the animal's apparent powers and will give the evidence *too much* weight. [Citation.] In light of the stringent foundational requirements which must be met before such evidence is admissible at all, however, we see no reason to categorize that evidence thereafter as inferior or untrustworthy, and instruct that it be given *less* weight than other evidence. . . . [W]hat the law in this state actually requires is not that dog trailing evidence be viewed with caution, but that it be treated as any other evidence, with its weight left to the trier of fact." (*People* v. *Malgren, supra*, 139 Cal.App.3d at pp. 241-242, italics in original.)

Appellant's position that the corroborating circumstances necessary when dog-tracking evidence is used must be "independent" evidence misjudges the reservations expressed by courts about this type of evidence. The concern is not trustworthiness for that is addressed in the threshold decision to admit the evidence. Rather, the concern is that there be other

circumstances supporting the accuracy of the inferences drawn from the dog-tracking evidence.

■ To corroborate means "to strengthen; to add weight or credibility to a thing by additional and confirming facts or evidence." (Black's Law Dict. (5th ed. 1979) p. 311.)

"In the first place, however, it becomes material to a correct understanding of the subject, to settle what is meant by the qualification, 'corroborating,' annexed to the term 'circumstances.' The phrase clearly does not mean facts which, independent of a confession, will warrant a conviction; for then the verdict would stand not on the confession, but upon those independent circumstances. To corroborate is to strengthen, to confirm by additional security, to add strength. The testimony of a witness[ ] is said to be corroborated[ ] when it is shewn to correspond with the representation of some other witness, or to comport with some facts otherwise known or established. Corroborating circumstances then, used in reference to a confession, are such as serve to strengthen it, to render it more probable, such in short, as may serve to impress a jury with belief in its truth." (*State* v. *Guild* (N.J. 1828) 10 N.J.L. 163, 187, as cited in Black's Law Dict. (4th ed. 1968) p. 414.)

■ In essence, the corroborating evidence need not, standing alone, link a defendant to the crime, but rather, when considered with all of the other evidence, including the dog-tracking evidence, allows assurance that the inferences we draw from any of the various pieces of circumstantial evidence, including the dog-tracking evidence, are correct. As with any circumstantial reasoning process, the ultimate conclusion is predicated upon many inferences that are drawn. However, before any of those inferences may be drawn, the underlying facts upon which those inferences depend must be proven beyond a reasonable doubt and the ultimate conclusion of guilt cannot be reconciled with any other rational conclusion. (CALJIC No. 2.01; *People* v. *Yrigoyen* (1955) 45 Cal.2d 46, 49 [286 P.2d 1].)

■ We, therefore, hold a conviction may be had where dog-tracking evidence is used and there is other corroborative evidence. We do not find the other corroborative evidence must, as a matter of law, be evidence which, standing alone, independently links the accused to the crime; the corroborative evidence need only support the accuracy of the tracking itself.

### Prejudice Analysis

■ Having found the trial court failed in its duty to charge the jury properly respecting the dog-tracking evidence, we must decide whether

appellant was prejudiced by the error. (*People* v. *Malgren, supra,* 139 Cal.App.3d at p. 242.) A review of the record convinces us that we cannot say appellant was not prejudiced by the error; not only was the case against appellant not overwhelming, not one piece of unambiguous corroborative evidence supported the identification. (*People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

The People enumerate several pieces of circumstantial evidence which they claim support the accuracy of the dog-tracking evidence. They claim the footprints found intermittently upon the track, along with a shiny dime, supply such corroboration. They cite to the fact the officer saw a heavy-set Mexican male suspect flee in the direction taken by the dog as supporting the evidence. Finally, the People seek to make much of the fact appellant was found lying face down in the tall grass when found and refused to speak when confronted by the officer. The problem is that each of these pieces of evidence is so attenuated from the inference necessary to support the accuracy of the dog-tracking evidence that we cannot say a jury, uninstructed that it must arrive at the supporting inference, would necessarily draw the inference championed by the People.

While the existence of the footprints was testified to, evidence linking appellant to the footprints was not presented. Evidence did come in that field workers were seen nearby. We do not know whether the shoes appellant was wearing when apprehended were dirty or indeed consistent with the prints made. The shiny dime, unconnected with either the burglary or appellant, does not necessarily support the accuracy of the tracking evidence.

Similarly, the record reveals the officer saw a heavy-set Mexican male run away from the house. Other than the fact appellant has a Spanish surname, nothing in the record links that fact with appellant.

Finally, the fact of appellant's lack of cooperation with the authorities upon their discovery of him in the grass does not necessarily support the dog-tracking evidence. The inferences from appellant's behavior are susceptible to just too many interpretations.

We cannot feel any certainty that a properly instructed jury necessarily would find any of the above evidence corroborative; the evidence was susceptible to too many inferences, some of which did not aid the People's case. This is not an instance where we are looking for substantial evidence to support the verdict reached by a properly instructed jury; were this the case, we would affirm. The question here is rather whether appellant was prejudiced by the trial court's failure to instruct the jury that it must find corrob-

orative circumstances. Based upon the evidence now in the record we find he was so prejudiced.

Because we must reverse appellant's conviction based upon our finding of prejudicial instructional error, we need not address the claimed error in instruction pursuant to *People* v. *Forte* (1988) 204 Cal.App.3d 1317 [251 Cal.Rptr. 855] and *People* v. *Brady* (1987) 190 Cal.App.3d 124 [235 Cal.Rptr. 248].

The judgment of conviction is reversed.

Martin, Acting P. J., and Dibiaso, J., concurred.