Pedigo v. Commonwealth.

---

CASE 5—INDICTMENT—JANUARY 22.

# Pedigo v. Commonwealth.

APPEAL FROM BARREN CIRCUIT COURT.

1. CRIMINAL LAW—EVIDENCE—TRAILING WITH BLOODHOUNDS.—Testimony as to trailing by bloodhounds of one charged with crime may be permitted to go to the jury for what it is worth as one of the circumstances which may tend to connect the defendant with the crime, when it is shown by some one having personal knowledge of the fact that the dog in question is of pure blood and of a stock characterized by acuteness of scent and power of discrimination, and is itself possessed of these qualities and has been trained or tested in their exercise in the tracking of human beings, and that the dog so trained and tested was laid on the

trail, whether visible or not, concerning which testimony has been admitted, at the point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicated to have been made by him.

2. EVIDENCE.—Under an indictment for arson it was error to permit a witness to testify that just before the burning charged, one other than the defendant had borrowed matches from her, it not being shown that the defendant was with the person, and no conspiracy having been charged.

LEWIS M'QUOWN FOR APPELLANT.

1. Evidence of tracking human beings by dogs is inadmissible. Hodge v. State, 13. South Rep., 385; Simpson v. State, 20 South Rep., 572; Jones on Evidence, sec. 371; Whitaker v. Parker, 42 Iowa, 586.

2. A witness can not be cross-examined as to collateral or incompetent matter for purposes of impeachment. Kennedy v. Commonwealth, 14 Bush, 357; Loving v. Commonwealth, 80 Ky., 511.

3. Courts will not speculate as to effect of incompetent evidence. Kennedy v. Commonwealth, 14 Bush, 361; Cappage v. Commonwealth, 3 Bush, 532.

W. S. TAYLOR AND JOHN SANDIDGE FOR APPELLEE.

(No brief in the record.)

JUDGE DuRELLE DELIVERED THE OPINION OF THE COURT.

Appellant was indicted jointly with Worth Wilson for burning the stock barn of L. W. Preston, on March 10, 1897, and, having been given a separate trial, was found guilty and sentenced to three years confinement in the penitentiary.

Upon the trial, Preston testified that, at ten minutes of nine in the evening, he discovered the fire coming through the barn from the southwest corner; and that he thereupon "telegraphed to Neighbors, at Elizabethtown, and got his bloodhound, that arrived the next day at noon, and carried him to the rear of the southwest corner of the barn; and the dog took a track and went in a south direction to the

lane, and went down the lane three panels, and crossed the fence through the place of Spencer into the street, and then up the street toward the dormitory, and up to the house of Nan Tunstel's, opposite the dormitory. The dog was then taken to the alley that leads out of the street, east, from the one on which the dormitory is situated; and the dog took a track then, and followed it up that street through the plank fence through Mr. Joe Smith's, following a path into the Knob road, out that road to Dolph Depp's gate, crossed the fence in a low place near the gate, and then through the swamp in the field toward my barn that was burned."

After testifying to some other matters, the witness further stated: "Next day after the fire, witness, following the dog, saw tracks going through Spencer's field; the tracks were about four feet apart, and were the tracks of one person, and looked like person was running, and dog followed that track. Witness staid from fifty to one hundred yards behind the dog trying to keep the crowd back." This was all the testimony in regard to the dog.

The barn was totally destroyed, together with a lot of horses and other stock and property.

It appears that the dormitory spoken of was situated about five hundred yards toward the center of town from Preston's barn, and was a tenement occupied by a large number of families and individuals, many of whom were of bad repute. Immediately opposite the dormitory, on Front street, was the house of Nan Tunstel, which appears to have been a house of ill-fame. It is admitted that both appellant and his co-defendant were at the dormitory and the Tunstel house before and after the fire, in company with Fannie Ho-

gan, a lewd woman, whom appellant was in the habit of visiting, and with Pearl Crumpton, another woman of the same class whom Wilson afterwards married.

Lula Simmons, another inmate of the dormitory, testified that, at "about good dark," on the evening of the fire, she was getting some mullein for use as medicine in the field back of Preston's barn; that she was just behind the barn, and about seventy-five yards from it, and when she started back she saw appellant come out of the back door and shut the door, and he said to her, "Hello! Lula; you will see a hell of a fire here in a little while;" that he then got over the fence back of the barn, staggering and apparently drunk, and came to where she was; that they walked together out of the field, through Depp's field (which lay in the direction of the dormitory from Preston's), down the lane back of Depp's house that leads down to the pike; that she got over the fence and went on through the field, but that appellant went toward the pike, while she went on back of Spencer's house, through his stable lot, and up the road to the dormitory. As nearly as can be ascertained from the bill of exceptions (which is quite indefinite as to the locations), the track followed by the dog coincides in some respects, though not in all, with that taken by appellant, according to the statement of the Simmons woman, so far as she claims to have seen his movements.

Two other witnesses testified to having seen, a short time before the fire, two unidentified men at the point in the lane where the dog was set to trailing the second time, and from which point the dog went in the direction of the barn. These witnesses knew both appellant and Wilson, but did not recognize either of the men.

Alice Cass, another inmate of the dormitory, was permitted to testify that, about three-quarters of an hour before the fire, Wilson came to her room and borrowed some matches; that some one was on the porch with him, but she did not know who it was. There was some testimony of statements by appellant after the fire tending to cast some suspicion upon him.

Preston had testified on re-direct examination that he saw Wilson in Louisville, told him there was a reward of $250 offered for the man who burned the barn, and that Wilson could have the reward if he would help to get the man, to which Wilson replied, "I am a poor fellow, and hard up, but I would hate to tell who it was, for Walter Pedigo is a good friend of mine." This testimony, of course, should not have been admitted, and was properly excluded from the jury on the day following.

The defense relied on was an alibi. The two women, Fannie Hogan and Pearl Crumpton, testified that appellant and his co-defendant, Wilson, were in their company all the evening until the time of the fire, and there was other corroborative testimony to the same effect.

Upon cross examination, the witness, Hogan, was asked if her husband (she being a married woman), had not said to her in Louisville, in the presence of Policeman Hessian, that she had left him and taken up with "a damned barn-burner," and if she had not replied that her husband would keep on until he got her connected with the barn burning; if Hessian did not ask her who it was that fell over the fence and hurt themselves, and if she had not said "It was not me, as we run;" and if she had not further said if she talked she

would get some one into trouble.  Having responded in the
negative, Hessian was permitted to contradict her and state
that the conversation indicated had taken place.  She was
further asked if she had not told Preston, in the presence
of Bailey, that she would tell him what she knew about the
fire if he would not ask her anything about Walter Pedigo,
and if she had not told Preston one of the Reynolds boys
burned it and got five dollars for it.  This was answered in
the negative, and Bailey was permitted to testify in regard
to the conversation indicated, the court in regard to this
testimony—and this only—cautioning the jury that the evi-
dence of Bailey was to be considered only as affecting the
credibility of the witness, Hogan.

From the statement of facts it is evident that the most
important question is, whether the testimony in regard to
the dog and his actions was competent.  On behalf of the
Commonwealth, it was urged that this testimony was admis-
sible for what it was worth as one of the circumstances
pointing to the guilt of appellant.  On the other hand, it is
insisted with great earnestness that, while evidence con-
cerning the tracking of human beings by dogs has been
sometimes acted upon by mobs, it has never been admitted
as competent in the courts of any State except one, and in
that one under conditions which did not exist in this case;
that if admissible at all, it is admissible solely upon the
ground that it is expert testimony, and that no evidence was
offered or admitted that the dog in question was qualified,
or had been trained to track human beings, or even that he
was in fact a bloodhound.

The only cases upon this subject to which we have been

referred, or which we have been able to find, arose in Ala-
bama. In the case of Hodge v. The State (13 Sou., 385), upon a
trial for murder, it appeared that on the night of the killing,
just after it was done, several witnesses went to the
place and discovered in close proximity to the house, man-
tracks. The tracks were sufficiently marked to be easily fol-
lowed, and were followed by several of the witnesses up to,
or very near to, the house of defendant. One of the wit-
nesses, while on the stand, was asked the following ques-
tion: If he had, at the time he was searching for tracks, a
trained dog for tracking a man? Against objection, the
witness was permitted to state that he did own such a dog;
that when the tracks were discovered near the house of de-
ceased he got his dog and put him on the tracks, and that
the dog, after taking the trail, followed the tracks and went
to defendant's house, being followed by the witness. Said
the court in that case:

"It is common knowledge that dogs may be trained to
follow the tracks of a human being with considerable cer-
tainty and accuracy. The evidence in this case showed
that a dog thus trained was, within a very short time after
the homicide, put upon the tracks of the person towards
whom all the circumstances strongly pointed as the guilty
agent, and that the dog, as if following these tracks, or
'trailing,' went to the house of the defendant."

There was other evidence showing that measurements
were made of the tracks at various points along the route,
and they were identified at each point as having been made
by the same shoes as were the tracks at the place of the
murder; and it was held that—

" . . . the fact that the dog, trained to track men as shown in the testimony, was put on the tracks at the scene of the homicide, and, 'taking the trail,' so to speak, went thence to defendant's house, where he, the defendant, is shown to have been that night after the killing, was competent to go to the jury for consideration by them in connection with all the other evidence as a circumstance tending to connect the defendant with the crime."

In a subsequent case in the same court, (Simpson v. State, 20 Sou., 573), upon a trial for arson, there was evidence introduced tending to show that the defendant was tracked by bloodhounds which had been put upon his track a short time after the building was burned.   The owner of the dogs (which were known as bloodhounds) testified that he had trained them to track human beings, and that they would not leave the track of a person, after they had been once put upon it, to follow another track.   On cross-examination, an attempt was made to weaken the effect of this testimony by asking the trainer and owner of the dogs if he had not trained certain bloodhounds kept at another place, of the same stock and breed as the dogs concerning which he had testified, close on to two years old, and if he did not know that they had recently been put on a human track, and had quit the track and gone off and killed a sheep.   In this case the court held:

"The court properly excluded from the jury the proposed evidence as to two bloodhounds, of the same breed of those employed to track the supposed criminal in this case, and trained by the same man, being put upon the trail of a human being, and leaving it to trail a sheep, which they overhauled

and killed. The test by comparison was not sufficiently certain to determine the reliability of the dogs employed here by reference to the qualities of the other dogs."

It is difficult to lay down a general rule as to the introduction of testimony of this kind. It is matter of common knowledge, of which courts are authorized to take notice, that dogs of some varieties (as the bloodhound, foxhound, pointer and setter) are remarkable for the acuteness of their sense of smell, and for their power of discrimination between the track they are first laid on and others which may cross it; but it is also matter of common knowledge that all dogs do not possess this power in the same degree, and that some dogs of purest pedigree prove worthless upon trial. It is stated in the Encyclopedia Britannica, title "Dog," that "The bloodhound, regarded by many as the original stock from which all the other varieties of British hounds have been derived, is now rarely to be met with in entire purity. Its distinguishing features are long, smooth and pendulous ears, from eight to nine inches in length, full muzzle, broad breast, muscular limbs, and a deep sonorous voice. The prevailing color is a reddish tan, darkening towards the upper part, and often varied with large black spots. It stands about twenty-eight inches high." It is stated in Webster that the bloodhound was formerly used for pursuing runaway slaves, and that "other varieties of dog are often used for the same purpose and go by the same name. The Cuban bloodhound is said to be a variety of the mastiff."

After a careful consideration of this case by the whole

[4]

court, we think it may be safely laid down that, in order to make such testimony competent, even when it is shown that the dog is of pure blood and of a stock characterized by acuteness of scent and power of discrimination, it must also be established that the dog in question is possessed of these qualities, and has been trained or tested in their exercise in the tracking of human beings, and that these facts must appear from the testimony of some person who has personal knowledge thereof. We think it must also appear that the dog so trained and tested was laid on the trail whether visible or not, concerning which, testimony has been admitted at a point where the circumstances tend clearly to show that the guilty party had been, or upon a track which such circumstances indicate to have been made by him. When so indicated, testimony as to trailing by a bloodhound may be permitted to go to the jury for what it is worth as one of the circumstances which may tend to connect the defendant with the crime of which he is accused. When not so indicated, the trial court should exclude the entire testimony in that regard from the jury. It is well known that the exercise of a mysterious power not possessed by human beings begets in the minds of many people a superstitious awe, like that inspired by the bleeding of a corpse at the touch of the supposed murderer, and that they see in such an exhibition a direct interposition of divine providence in aid of human justice. The very name by which the animal is called has a direct tendency to enhance the impressiveness of the performance, and it would be dangerous in the extreme to permit the introduction of such testimony in a criminal case under conditions which did not fully justify its

Pedigo v. Commonwealth.

consideration as a circumstance tending to connect the accused with the crime.

In this case there was no testimony showing that the dog had been trained or tested.

As the case must therefore be reversed and sent back for a new trial, we will consider the other alleged errors for which a reversal is sought.

The testimony of Alice Cass as to the borrowing of the matches seems to us, while not particularly material, to be hardly sufficiently connected with this appellant, as there is no direct testimony to show that appellant was in Wilson's company at the time; and this the more, as the indictment does not charge conspiracy.

As to the questions asked on cross-examination of Fannie Hogan, the answers to which various witnesses for the Commonwealth were permitted, against objection, to contradict, we are of opinion that the statements proved by Hessian, Preston and Bailey were not contradictory of, or inconsistent with, her testimony in chief upon any material matters, and were therefore incompetent. The opinion of the witness Hogan's husband that appellant was a barn-burner was clearly incompetent. (Kennedy v. Com., 14 Bush, 357; Loving v. Com., 80 Ky., 511; Stephens Dig. Law, Ev., see A. & E. Encl., 7, page 109.) And we think the other statements of these witnesses in contradiction of the witness Hogan were as to matters collateral to the testimony in chief of the witness, and therefore irrelevant.

For the reasons stated, the judgment is reversed and the cause remanded, with directions to award appellant a new trial, and for further proceedings consistent with this opinion.

Judge Guffy dissents from so much of this opinion as holds testimony in regard to the trailing by the dog admissible under any circumstances.

JUDGE GUFFY DELIVERED THE FOLLOWING DISSENTING OPINION:

I concur in the reversal of the judgment in this case. But dissent from so much of the majority opinion as holds that the trailing or proven trailing of the defendant by a bloodhound can be introduced as evidence upon the trial of such person charged with any crime. It is true that the majority opinion so restricts such proof and requires so many conditions precedent that if the opinion in question should be strictly adhered to no great injustice would very often result from evidence admitted under the ruling in question.

It, however, seems to me with due respect to the majority opinion that such a rule of evidence is contrary to all other rules of evidence, and, if not in violation of the letter of the Constitution, is manifestly in violation of the spirit as heretofore expounded by this court. Such a rule seems to me an innovation upon all the heretofore established rules of testimony. The use of bloodhounds was, perhaps, necessary to efficiently and effectually uphold the institution of slavery, as well as to aid in the arrest and capture of persons accused of crime in the dark ages. In such cases, however, the object sought was the arrest or capture of known fugitives. If the dog in fact took up and followed the trail of a fugitive and found him, or aided his pursuers to find him, the object was accomplished, and there could be no mistake as to whether he was the party sought or not. His guilt and right of capture having been theretofore established, and in fact being

Pedigo v. Commonwealth.

unquestioned.   If the hound took the wrong trail and brought
to bay the wrong party that fact would be ascertained so soon
as the pursuers reached the party, and the utility of the
hound in that regard then ceased.   It is now proposed to
use the hound not to capture a fugitive, but to ascertain or
furnish evidence to convict some citizen of crime.   It seems
to me that this new use of the bloodhound is a radical de-
parture from the former purposes for which they were used;
but whether this be so or not, it seems to me that neither the
life not liberty of a citizen should be taken away, or even
jeopardized by the mere fact that some person testified that
the hound was well trained to track human beings, etc., and
that he had trailed the accused from the scene of the crime
to the habitation of the accused, or until he came upon the
accused party.   There is danger that the effect of the major-
ity opinion will likely be to greatly promote the raising and
training of bloodhounds, or hounds that will be called blood-
hounds.   It is a well-known fact that the owners of hounds,
as well as other property, usually hold such property in high
esteem; and as the owner or trainer of hounds will be en-
gaged in the business for pay, it will be greatly to their in-
terest to always have well trained hounds.   In fact, I pre-
sume, there will be none but trained and expert hounds in a
few years; at least such will be the opinion of their owners
for it would be utterly useless to have any other sort.

It is common tradition, and doubtless believed by quite a
large number of persons, that bloodhounds are capable of
wonderful feats of trailing.   In fact the many wonderful
stories told of the achievements of bloodhounds (mostly in
the imagination of those originating them) have instilled into

the minds of quite a number of persons such wonderful notions of the unerring, if not infallible knowledge and intelligence of the hounds, that the fact the hound said that a certain person had lately been at the place where the crime was committed would be the most conclusive proof that could be produced.

If it should even be conceded that every owner and trainer of hounds would be perfectly fair and impartial in endeavoring to strike the trail only of the party who had been at the scene of the crime, and likewise impartial in his testimony as to the expertness of the dog, yet such evidence is entirely too vague and uncertain to be allowed to jeopardize the liberty of a free man. It seems from common history, as well as the proof in this case, that the bloodhound is supposed to be capable of taking up and following the trail of a human being that has been made from twenty-four to forty hours. If that be true, and it is unreasonable, then it must necessarily follow that the hound aforesaid could take up the scent of a man who had passed within a quarter of a mile of the place a few hours before the hound was taken to the place to find the scent. I think this conclusion necessarily follows. Take for example the case at bar. It seems that the barn was located in an open field, and the prosecution would have us believe that many hours thereafter the hound was able to take the trail and follow it. It is reasonably certain that a man wearing shoes would leave less scent on the ground to remain for twelve or fifteen hours than he would leave if going through timber. It therefore follows, as I think, that if a hound was taken to the scene of the crime, or supposed crime, and any person had passed shortly before the arrival

of the dog within a quarter of a mile of the place, especially if his route lay through timber, the dog finding no scent at the point where he was taken to search for same, and knowing, if he knew anything, that he was desired to trail some human being, he would naturally go to the place and in the direction of the scent, or in other words would find the trail by reason of his acute scent of some person who had passed sufficiently near the place to enable the hound to take up the scent. It would be impossible to demonstrate whether or not he found the actual trail at the spot to which he was taken, or whether, as all dogs will do when it is sought to put them on a trail, he commenced hunting for one, and so continued until a trail was found in that vicinity.

It may also be assumed as certain that the hound would take up the first trail or follow the first trail that reached or affected his olfactory nerves after it was made known to him that he was there for the purpose of trailing somebody. I do not think it is possible to establish the fact that the hound will not quit the first trail that he may take up and go off with another which he might happen to fall in with or across. Doubtless his keeper would often be of the opinion that the hound would never take up a trail other than the one he first took.

I do not think that the evidence as to what the hound said or indicated should ever be admitted as testimony for the further reason that there is too much danger of an innocent person being convicted, or at least arrested and permanently disgraced by the admission of such testimony. This case illustrates the danger alluded to. From the evidence in this case it is highly probable that quite a number

Pedigo v. Cómmonwealth.

of persons went that very night to the dormitory, or to the
house opposite the dormitory, and if they happened to pass
by or near the barn the dog of necessity was as apt to take
one trail as another, and hence there would be no sort of
certainly in his trailing the criminal, if any there was. To
illustrate further, it is learned from common rumor and
from the press that a great many toll-gates have been lately
destroyed, and it seems very difficult to ascertain who are the
guilty parties. The gates are on the public highway where
persons pass, and have the right to pass and re-pass, yet
if a bloodhound should be taken to the scene of the crime
within a reasonable time thereafter for the purpose of trail-
ing the guilty party, he would be almost certain to find some
trail, and trail some person to his home, and after having
been sufficiently shown to be an expert, etc., his testimony
would be admitted to fix the guilt upon some party perhaps
entirely innocent, and who in the exercise of his right had
passed that way. The same may be said as to a large num-
ber of crimes supposed to have been clandestinely committed,
or in fact have been committed. Many houses and barns
are burned down. Some fires are of incendiary origin, while
a number are the result of accidents or carelessness; yet
under the majority opinion in this case, it would seem
that if an expert hound trailed a party from the scene of
the burning to his home, or place where he was known to have
been shortly after the fire, that fact might be proven in
evidence against him, although in fact he might not have been
there at all, or if he had been, had simply been a casual
passerby. Such evidence should not be admitted for the rea-
son that the defendant is not permitted to cross-examine the

witness, who in reality is the dog, whether he is the legal witness or not. I am aware that it has been held that you could prove dying declarations against the defendant, and it has been said that he has the constitutional privilege of meeting the witness face to face, because the party testifying is the one who is reciting the dying declarations, but the admission of the statement or trailing by the hound is not a parallel case. The trailing of the hound, if evidence at all, must be upon the supposition that he took the track at the scene of the crime and followed it, but the defendant has no chance to inquire of the hound how far from the place did he really find the trail, or did he cross any other or find any others. If a person was testifying to having tracked the defendant from or about the place, he could be cross-examined upon that subject to know whether there was any other track, and which appeared to be the freshest, and size, and whether the trail he was following crossed or fell in with other trails. Not so with the dog. He has had his say and left. There is another familiar rule of law, that A, a witness, will not be allowed to testify that B told him that he saw the defendant at the place, or that he trailed him or saw him going from the scene of the crime; but it seems to be contended in this case that A may tell what the dog said about it. A person may be murdered in a highway or road that is rightfully traveled by numerous persons, twenty-five or fifty persons may have passed within less than a dozen hours, and upon the discovery of the crime a bloodhound may be brought there, and, if he has any of the attributes which he is generally credited with, he will certainly find some trail, and land somewhere. Would it be

right to allow that fact to be proven against the party accused of the murder? If such evidence be admitted, it seems to me that a man might in fact be hung without any other evidence than the mere fact that the bloodhound was proven to have taken up the trail at the scene of the murder and followed it to the house of the defendant. Such evidence must tend to establish his guilt, else it could not be admitted, and if the jury upon such evidence found him guilty how could this court reverse? It will not do to say that the jury will not convict a party upon such testimony. As matter of fact and common history, some party is very likely to be suspected of the crime, and after suspicion to a greater or less extent permeates the community, but little additional evidence is required to convict the accused, especially if he be defenseless or destitute of friends and facilities for making a defense.

It seems that if the conditions described in the opinion were complied with, the fact that the hound trailed a person from the scene of the crime would be sufficient to authorize a warrant of arrest, and would be such probable cause as to protect the party procuring the arrest, and thus a citizen might be put to great expense, mortification and disgrace without any evidence at all against him, except the trailing of the hound, and have no redress for any of the wrongs so inflicted. As before intimated it seems to me that the use of the bloodhound properly belonged to the days of slavery and of the bloody criminal code of the dark ages, and inasmuch as the institution of slavery and the code aforesaid have ceased to exist, the hound should be relegated to innocuous desuetude.